

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 2, 2019**

_____

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 18-40107-ELM-13 |
| JAMES HENRY WILSON and | § | |
| SHARONDA NICOLE WILSON, | § | Chapter 13 |
| | § | |
|     Debtors. | § | |
| | § | |
| JAMES HENRY WILSON and | § | |
| SHARONDA NICOLE WILSON, | § | |
| | § | |
|     Plaintiffs, | § | |
| v. | § | Adversary No. 19-04006 |
| | § | |
| ARBORS OF CENTRAL PARK ICG, LLC, | § | |
| | § | |
|     Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[*]

On July 19, 2019, the above-captioned adversary proceeding came on for trial before the

Court.  Plaintiffs James Henry Wilson and Sharonda Nicole Wilson (the "**Wilsons**"), chapter 13

debtors in Case No. 18-40107 (the "**Bankruptcy Case**"), allege that Defendant Arbors of Central

_____

[*] Amending Docket No. 29 to correct certain typographical errors.

Park ICG, LLC ("**Arbors**") (a) committed an abuse of process by obtaining the Court's entry of an order on Arbors' motion for relief from the automatic stay[1] of the Bankruptcy Code[2] that conflicted with the Court's previous oral ruling on the motion, and by also failing to "comply with or seek relief from the automatic stay," and (b) violated the automatic stay when it commenced and prosecuted an eviction action against the Wilsons. The Wilsons request relief in the form of a declaration finding that Arbors' actions were in violation of the stay and in contempt of court, and that the eviction judgment obtained by Arbors is void;[3] an award of compensatory and punitive damages and sanctions against Arbors for its alleged abuse of process, stay violation and contempt;[4] an award of attorneys' fees and costs against Arbors;[5] and injunctive relief to compel Arbors to comply with the Bankruptcy Code in connection with any further pursuit of its rights and claims against the Wilsons.[6] Arbors denies that it took any improper or unlawful action, denies that the Wilsons are entitled to any relief, and asserts a counterclaim against the Wilsons for the recovery of attorneys' fees and costs on account of the Wilsons' alleged frivolous action in bringing this adversary proceeding.[7]

Having considered the Wilsons' Complaint, Arbors' Answer and Counterclaim, the Wilsons' Reply to Counterclaim,[8] the parties' stipulated facts,[9] the parties' respective pretrial

---

[1] *See* 11 U.S.C. § 362(a) (setting out the provisions of the automatic stay).

[2] 11 U.S.C. § 101, *et seq.* (the "**Bankruptcy Code**").

[3] *See* Docket No. 1 (the "**Complaint**"), Counts II, IV and VI.

[4] *See id.*, Counts II, IV and V.

[5] *See id.*, Counts I-II and IV-VII.

[6] *See id.*, Count I. In Count III of their Complaint, the Wilsons also assert a claim against Arbors for violation of the Wilsons' confirmed chapter 13 plan and the order confirming the Plan. *See* Complaint, Count III. At trial, however, the Wilsons waived this count.

[7] *See* Docket No. 5 (the "**Answer**"), ¶ 65 (the "**Counterclaim**").

[8] Docket No. 6.

[9] *See* Docket No. 13 (the "**Pretrial Order**"), ¶¶ B.1.-B.15.

submissions,[10] the evidence introduced at trial, and the arguments of counsel, the Court now issues

its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52, as

made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.[11]

## JURISDICTION

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and

157 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc*

*(Miscellaneous Rule No. 33)* of the United States District Court for the Northern District of Texas.

Venue of the proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409.  The

proceeding constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O).

Pursuant to 28 U.S.C. § 157(b)(1) the Court has the statutory authority to enter a final judgment in

this proceeding and based upon the nature of the causes of action at issue there are no *Stern*-based

Constitutional limitations[12] to the Court doing so.

## FINDINGS OF FACT

**A.      The Wilsons' Apartment Lease with Arbors**

1.      Arbors is the owner of an apartment complex located at 2809 Parkview Lane in

Bedford, Texas.  In 2016, the Wilsons entered into an agreement with Arbors for the lease of

Apartment 3125 at the complex (the "**Apartment**").[13]

---

[10] *See* Docket Nos. 11 and 15.

[11] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include any findings of fact, they should be deemed as such.

[12] *See Stern v. Marshall*, 564 U.S. 462, 131 S. Ct. 2594 (2011).

[13] *See* Exhibit 1 (leasing ledger maintained by Arbors with respect to the Wilsons).

2.      On or about September 27, 2017, the Wilsons renewed their lease of the Apartment by entering into a new lease agreement with Arbors (the "**2017 Lease**").[14]  The 2017 Lease provided for a new definitive lease term of November 14, 2017 through November 9, 2018, with automatic renewal on a month-to-month basis thereafter until the time of the Wilsons' or Arbors' provision of at least 60 days' written notice of termination.[15]

3.      Pursuant to the 2017 Lease, the Wilsons were obligated to make monthly rent payments of $1,142 by the first of each month.  No grace period for such payment was provided and the lease expressly stated that the failure to pay rent by the first of the month would constitute a material breach of the lease.[16]  In the event of non-payment, the lease also imposed a late fee of $75.00 for the failure to pay by the second day of the month, plus additional late fees of $10.00 per day thereafter, up to a maximum of $150.00 per month, until paid in full.[17]  In addition to rent, the 2017 Lease also provided for the assessment/allocation of various fees and charges, including a monthly billing fee, a monthly pest control fee, a monthly trash/valet trash service fee, and monthly water and sewer charges (collectively, "**additional lease charges**").[18]

**B.      The Prepetition Default, Bankruptcy Filing and Further Lease Renewal**

4.      Shortly after execution of the 2017 Lease, the Wilsons began to regularly fall behind in the timely payment of rent.  Thus, on or about December 22, 2017, after the Wilsons had failed to pay their December 2017 rent on time, Arbors filed a sworn complaint in Texas state

---

[14] *See* Exhibit A (2017 Lease).

[15] *See id.*, ¶ 3.

[16] *See id.*, ¶ 6.

[17] *See id.*

[18] *See id.*, ¶¶ 6, 9 and 42 and "Summary of Key Information" preceding ¶ 42.

court for the eviction of the Wilsons from the Apartment and for the recovery of December 2017 rent. A hearing was scheduled in the action for January 10, 2018.

5. On January 9, 2018, prior to the eviction hearing, the Wilsons filed their joint voluntary petition for relief under chapter 13 of the of the Bankruptcy Code, thereby initiating the Bankruptcy Case and causing the eviction action to be stayed pursuant to the Bankruptcy Code's automatic stay provisions.[19]

6. On January 25, 2018, the Wilsons filed their proposed chapter 13 plan in the Bankruptcy Case, wherein the Wilsons proposed to assume the 2017 Lease and cure the outstanding lease arrears.[20] By order entered on March 12, 2018, the plan was confirmed.[21]

7. Between February 2018 and September 2018, the Wilsons often failed to pay rent by the first of the month as required by the 2017 Lease, instead paying by the second or third of the month. During this time frame, Arbors elected to accept the payments (with applicable late fees) instead of declaring a default.

8. Prior to the end of the definitive lease term of the 2017 Lease, Arbors provided the Wilsons the opportunity to again renew their lease. Arbors notified the Wilsons of such opportunity in writing. According to Eileen Rigsby ("**Rigsby**"), the Property Manager of the apartment complex, the renewal notice also informed the Wilsons of Arbors' intent to charge a month-to-month rental rate of $1,399 after the end of the definitive lease term in the event of non-renewal.[22]

---

[19] *See* 11 U.S.C. § 362(a)(1), (a)(3) and (a)(6).

[20] *See* Exhibit C (proposed plan).

[21] *See* Exhibit F (confirmation order).

[22] *See* 2017 Lease, ¶ 16 (providing Arbors the right to charge increased month-to-month rent following the end the definitive lease term provided notice of the increased rent level is provided at least 5 days prior to the 60-day notice of termination period specified in ¶ 3 of the 2017 Lease).

9.    Desiring to remain in the Apartment, the Wilsons went to the leasing office of the complex on September 13, 2018 to complete the lease renewal paperwork.  At that time, Arbors offered a new lease (the "**2018 Lease**")[23] having substantially identical provisions as the 2017 Lease except for a new definitive lease term of November 10, 2018 (the day after the end of the definitive lease term of the 2017 Lease) through November 5, 2019 and an increase in the monthly rental rate to $1,199 – the prorated portion of the first month's rent (*i.e.* for the period November 10, 2018 through November 30, 2018) to be due on November 10, 2018.[24]  The Wilsons agreed to the new lease terms and Arbors documented the Wilsons' acceptance of the new 2018 Lease by obtaining their electronic signatures thereon at the September 13, 2018 meeting.[25]  At this point the Wilsons reasonably believed that the 2018 Lease was effective and would govern the parties' leasing relationship from and after November 10, 2018.  Moreover, Arbors provided a copy of the electronically signed 2018 Lease to the Wilsons for their records at the end of the meeting, further evidencing Arbors' mutual acceptance of the lease and promise to countersign it.

**C.    The Post-Petition Default and Lift Stay Proceedings**

10.    In October 2018, prior to commencement of the new lease term, the Wilsons again failed to pay rent by the first of the month.  This time Arbors decided to take action and on October 3, 2018, filed a motion for relief from the automatic stay to pursue the eviction of the Wilsons from the Apartment (the "**Lift Stay Motion**").[26]  On the same day, the Wilsons attempted to make the October rent payment, but Arbors, having already filed the Lift Stay Motion, refused to accept the payment.

---

[23] *See* Exhibit G (2018 Lease).

[24] *See id.*, ¶¶ 3 and 6.

[25] *See id.* (last page)

[26] *See* Exhibit H (Lift Stay Motion).

11.     On October 24, 2018, the Court[27] held a hearing on the Lift Stay Motion (the "**Lift Stay Hearing**") at which Arbors was represented by The Floyd Firm (the "**Floyd Firm**") and the Wilsons were represented by the Lee Law Firm, PLLC (the "**Lee Firm**").  At the conclusion of the Lift Stay Hearing, the Court orally ruled that the Lift Stay Motion would be conditionally denied subject to the Wilsons' compliance with the following requirements: (a) the Wilsons' payment of the October 2018 rent plus late fee to Arbors by no later than October 25, 2018, (b) the Wilsons' payment of November 2018 rent to Arbors on or before November 2, 2018,[28] and (c) the Wilsons' payment of remaining rent when due, subject to one five business day opportunity to cure in the event of a default (the "**Oral Ruling**").[29]  The Court instructed the Floyd Firm to prepare a proposed order in conformity with the Oral Ruling, to circulate the proposed order to the Lee Firm for review and approval as to form, and to thereafter submit the mutually approved form of order to the Court for entry.[30]

12.     In conformity with the Court's direction, the Floyd Firm prepared the proposed order.  In contravention of the Court's direction, however, the Floyd Firm submitted the proposed order to the Court without having first circulated it to the Lee Firm and obtained the Lee Firm's approval as to its form on behalf of the Wilsons.  On November 8, 2018, the Court entered the

---

[27] The Honorable Russell F. Nelms presiding.

[28] While the record suggests that Judge Nelms, after announcing the November 2, 2018 deadline, might have reconsidered the deadline in response to additional argument by counsel, *see generally* Exhibit M, at pp.6-9, the parties have stipulated that Judge Nelms ruled that the Wilsons would have until November 2, 2018 to make the November 2018 rent payment.  *See* Pretrial Order, ¶ B.9 ("On October 24, 2018, the Court held a hearing regarding the [Lift Stay] Motion and ruled that [the Wilsons] should … pay November's rent on or before November 2nd….").  Therefore, the Court accepts the parties' stipulation on this point.

[29] *See* Exhibit M (transcript of Lift Stay Hearing).

[30] *See id.*, at p.9.

proposed order, believing that it had been agreed upon as to form (as entered, the "**Lift Stay Order**").[31]  Pursuant to the Lift Stay Order, the Court ordered the following:

> [The Wilsons] are to pay October 2018 rent in the amount of $1,199.00 [sic.][32] plus late fee of $75.00 by 5:00 p.m., on Thursday, October 25, 2018 and are to continue paying the monthly rent of $1,199.00 thereafter for the term of their Lease.  The [Wilsons] are to make the monthly payments by the first day of each month but are given a one-time grace period of five (5) days.  If payment is not made in a timely manner, relief from the automatic stay is hereby granted to permit [Arbors] to proceed with an eviction claim against the [Wilsons] as further stated in the [Lift Stay Motion].

**D.**     ***Arbors Provides Ineffective Notice of Non-Renewal, Improperly Charges Excess Rent, and Unlawfully Commences Eviction Proceedings***

13.     The Wilsons paid their October 2018 rent by the October 25, 2018 deadline and their November 2018 rent by the November 2, 2018 deadline.[33]  Notwithstanding same, Arbors continued to aggressively pursue means to justify the eviction of the Wilsons.  In doing so, Arbors embarked upon an improper, ill-advised strategy to both terminate the lease and manufacture a default for purposes of obtaining relief from the automatic stay under the terms of the Lift Stay Order.

14.     First, despite having offered the 2018 Lease to the Wilsons and obtained their acceptance of the same, Arbors decided to pivot after-the-fact and take the position, without notice to the Wilsons, that Arbors never actually *legally* agreed to the new lease.  Specifically, Rigsby testified at trial that because the 2018 Lease was never formally countersigned by an authorized agent of Arbors, Arbors was not bound to it.  Thus, under the premise that the lease had not been

---

[31] *See* Exhibit I (Lift Stay Order).

[32] The increased monthly rental rate of $1,199 under the 2018 Lease did apply until the commencement of the term of the 2018 Lease in November 2018.  Pursuant to the then-applicable 2017 Lease, October 2018 monthly rent was $1,142.  Notwithstanding the erroneous insertion of the 2018 Lease rental rate for October 2018 rent, Arbors charged the Wilsons the correct $1,142 rental amount in October 2018.  *See* Exhibit 1, at p.3.

[33] *See* Pretrial Order, ¶ B.11 (stipulated facts).

renewed, Arbors issued a notice to the Wilsons on November 6, 2018 titled "ADVANCE NOTICE OF LEASE TERMINATION AT END OF LEASE TERM OR RENEWAL PERIOD" pursuant to which Arbors gave notice to the Wilsons "to vacate at end of lease term or renewal period," referencing "TAA Lease Contract dated 10/19/2016," and of the non-renewal of the "TAA Lease Contract end[ing] on November 9th, 2018."[34]  Arbors also included the following language in the notice: "According to the advance notice provision of your lease, we are writing this letter to give you sufficient notice that your lease will not automatically renew.  We request that you move out and return possession of your dwelling unit to us on December 9th, 2018.  Please consider this letter as lawful notice to vacate on that date."[35]

15.    Inasmuch as the notice referenced both a prior 2016 lease no longer in effect and the 2017 Lease, creating a level of confusion and uncertainty, and given the fact that the Wilsons had already executed the new 2018 Lease, and that the parties' ongoing leasing relationship had been addressed in connection with the Lift Stay Hearing, the Wilsons reasonably believed that the notice had been issued in error and disregarded it.  Indeed, in submitting the proposed order – signed with approval by the Floyd Firm on behalf of Arbors – with the new monthly rental rate of $1,199 under the 2018 Lease and obtaining the Court's acceptance of the same in entering the Lift Stay Order,[36] Arbors acknowledged its understanding and agreement to the validity of the 2018 Lease.  Arbors never thereafter requested any modification to the Lift Stay Order.  Thus, Arbors clearly manifested its agreement to the terms of the 2018 Lease.  Moreover, the notice of non-renewal issued to the Wilsons also failed to comply with the 60-day termination notice requirement

---

[34] See Exhibit U.

[35] Id.

[36] See Exhibit I, at p.2 ("Debtors … are to continue paying the monthly rent of $1,199.00 [after October 2018] for the term of their Lease.").

under the 2017 Lease.[37]  For these reasons, the notice of non-renewal was both inapplicable and wholly ineffective.[38]

16.     The second ill-advised action taken by Arbors involved the charging of rent in excess of the terms of the 2018 Lease.  Specifically, from and after November 10, 2018 (being the end of the definitive lease term of the 2017 Lease) Arbors charged rent at the $1,399 month-to-month rate previously noticed to the Wilsons in connection with the lease renewal process instead of the $1,199 monthly rental rate agreed upon under the 2018 Lease and acknowledged as applicable in the Lift Stay Order.  Based upon Arbors' application of the $1,399 monthly rental rate, and despite Arbors' pretrial stipulation that the Wilsons timely paid November and December 2018 rent,[39] Rigsby testified at trial that the Wilsons (who paid at the $1,199 rent level) defaulted by failing to pay the *full amount* of the rent due.  Thus, according to Rigsby this also resulted in the Wilsons' loss of their one-time, five-day grace period to cure under the Lift Stay Order heading into January 2019.

17.     On December 31, 2018, the Wilsons obtained money orders aggregating $1,278.73 for January 2019 rent and associated additional lease charges – $1,199 for rent plus $79.73 for the additional lease charges.[40]  By the time of their arrival at the leasing office on December 31st, however, the office was closed.  The next day the leasing office was closed in observance of the New Year's Day holiday.  Thus, because the complex did not have a drop box for tenant payments,

---

[37] *See* 2017 Lease, ¶ 3.

[38] Because of Arbors' non-compliance with the termination provisions of the lease, Arbors' issuance of the notice of non-renewal also constituted a violation of the automatic stay and was, thus, ineffective on this basis as well.  *See, e.g., 48th Street Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th Street Steakhouse, Inc.)*, 835 F.2d 427, 430-31 (2nd Cir. 1987), *cert. denied*, 485 U.S. 1035 (1988).

[39] *See* Pretrial Order, ¶ B.11 ("Plaintiffs remitted … November's rent on the 2nd, and December's rent on the 1st").

[40] *See* Exhibit J, at pp.13-16 (copies of the 12/31/2018 money orders obtained); Exhibit 1, at pp. 2-3 (reflecting additional lease charges).

the Wilsons were unable to make their January 2019 payment when due on the first of the month. Then, when the Wilsons attempted to make the payment on January 2, 2019, Arbors refused the payment. At this point, the Wilsons contacted their counsel for assistance.

18. When the Lee Firm contacted the Floyd Firm to discuss the matter, the Floyd Firm informed the Lee Firm that the payment was refused for two reasons: (1) because it was for less than the full amount due; and (2) because it was late. In relation to the first point, properly applying the monthly rental rate of $1,199 under the 2018 Lease, the Wilsons in fact tendered the full amount of their January 2019 rent on January 2, 2019. Therefore, the first basis for refusal of the rent was improper. In relation to the second point, under the terms of the Lift Stay Order, the Wilsons were entitled to a one-time, five-day grace period to cure. Here, as previously mentioned, Arbors took the position that the Wilsons had already lost that benefit by failing to pay rent at the $1,399 level in November and December 2018. Properly applying the monthly rental rate of $1,199 from and after November 10, 2018, however, the Wilsons in fact paid the full amount of their November[41] and December 2018 rent on time. Consequently, the second basis for refusal of the rent was also improper.

19. Notwithstanding same, on January 9, 2019, Arbors filed a sworn complaint with the Justice Court, Precinct 3, in Tarrant County, Texas, for the eviction of the Wilsons from the Apartment and for unpaid rent, alleging that the Wilsons had failed to pay the full balance of rent due in November 2018, December 2018 and January 2019 (the "**Eviction Action**").[42]

---

[41] In fact, because the Wilsons paid the full amount of the new $1,199 rate in November 2018 instead of prorating the new rate for the period from and after November 10, 2018, they overpaid their November 2018 rent by $17.10 (*i.e.* $1,199.00 *minus* ($342.60 [$1,142 / 30 * 9 days] *plus* $839.30 [$1,199 / 30 * 21 days]) = $17.10).

[42] *See* Exhibit L (eviction complaint).

20.    Upon learning of the Eviction Action, the Lee Firm communicated to the Floyd Firm that Arbors' continuing pursuit of the Eviction Action would be in violation of the automatic stay.  The Wilsons also filed a suggestion of bankruptcy in the action to try to prevent it from moving forward.  Nevertheless, on January 29, 2019, Arbors proceeded to prosecute the complaint for eviction, and having convinced the state court that the automatic stay was no longer in force, obtained entry of a default judgment against the Wilsons for possession of the Apartment and for unpaid rent in the amount of $1,475.89 (the "**Default Judgment**").[43]

21.    On the same day, the Wilsons timely appealed the Default Judgment to the Texas County Court at Law in Tarrant County, Texas, thereby initiating a *de novo* proceeding (the "**Eviction Appellate Proceeding**"),[44] and a few days later commenced this adversary proceeding. By agreement of the parties, the Eviction Appellate Proceeding has been stayed pending the outcome of this adversary proceeding.  Since February 2019, however, the Wilsons have been required to pay $1,399 per month into the registry of the Texas state court in order to preserve their right to possession and use of the Apartment pending the outcome of this adversary proceeding and the Eviction Appellate Proceeding.[45]

**E.    *Damages Sustained by the Wilsons on Account of Arbors' Actions***

22.    Arbors' filing and prosecution of the Eviction Action was in violation of the automatic stay.[46]  Contrary to Arbors' position, the stay relief provisions of the Lift Stay Order were not triggered in January 2019.  Each of Arbors' actions in commencing the Eviction Action, prosecuting the Eviction Action, and convincing the state court that the automatic stay was no

---

[43] *See* Exhibit N (docket of eviction action).

[44] *See id.; see also* Tex. R. Civ. P. 506.3 (Texas rule of procedure relating to appeal of eviction judgment).

[45] *See, e.g.*, Exhibit O, at p.2; Docket Nos. 16, 18, 20 and 27.

[46] *See* 11 U.S.C. § 362(a)(3).

longer applicable in the face of the suggestion of bankruptcy filed by the Wilsons in order to obtain the state court's issuance of the Default Judgment was willfully and intentionally undertaken by Arbors with full knowledge of the existence of the automatic stay.

### (1)    Compensatory Damages

23.    As a result of Arbors' actions, the Wilsons have suffered the following actual compensatory damages:

### (a) Rent-Related Damages

24.    Arbors began to misapply the $1,399 per month rental rate effective November 10, 2018.  Based upon Arbors' representations to the state court of the applicability of the $1,399 rate, the state court awarded $1,475.89 in damages to Arbors under the Default Judgment for unpaid rent through and including January 2019.  Consequently, upon initiation of the Eviction Appellate Proceeding, the Wilsons were required to post a $1,500 cash bond with the state court as security for the damages awarded.[47]  The Wilsons posted the bond in compliance with the state court's directive.[48]  Thus, the first step in considering rent-related damages is to determine how much of the bond is properly refundable to the Wilsons, which in turn requires a determination of how much the Wilsons owed to Arbors through January 2019.  Applying the proper $1,199 rental rate, the Wilsons had already timely paid their November and December 2018 rent, and as of January 2, 2019, the date of Arbors' refusal of the Wilsons' payment, the total amount of January 2019 rent and additional lease charges was $1,278.73 ($1,199 in rent plus $79.73 in additional lease charges).[49]  Therefore, the Wilsons were forced to provide $221.27 in excess security in posting the bond.

---

[47] See Exhibit O, at p.1

[48] See id., at p.4.

[49] See Exhibit 1, at pp.2-3 (entries dated 1/1/2019 with respect to additional lease charges assessed in January 2019).

25.     Thereafter, beginning in February 2019 and continuing through and including November 2019, the Wilsons have been required to make payments of $1,399 per month into the state court registry in order to retain possession and use of the Apartment pending the outcome of this adversary proceeding and the Eviction Appellate Proceeding.  Thus, applying the proper monthly rental rate of $1,199 under the 2018 Lease, the Wilsons have been required to overpay rent by $200 per month during this ten-month time frame, for a total of $2,000.  However, the Wilsons have also incurred additional lease charges[50] during these months (collectively, the "**2/2019-11/2019 Additional Lease Charges**") which are properly deductible from the $2,000 if, and to the extent, not already separately paid by the Wilsons.

26.     Thus, on a combined basis, the Wilsons have sustained rent-related damages in the amount of $2,221.27 less the amount of the 2/2019-11/2019 Additional Lease Charges (if, and to the extent, not already separately paid by the Wilsons).

### *(b) Court Costs Associated with Eviction Appellate Proceeding*

27.     Next, the Wilsons have also incurred the following court costs, aggregating $285.20, that they were required to pay in connection with the Eviction Appellate Proceeding: $20 transcript fee;[51] court costs and payment processing fees of $258.55;[52] certified mail expense of $5.65;[53] and copy charges of $1.00.[54]

---

[50] Excluding, for the avoidance of doubt, any late fees that may have been assessed during these months.  Because of Arbors' actions, the assessment of any late fees during this time frame would have been improper and are hereby determined to be unenforceable.

[51] *See* Exhibit O, at p.3.

[52] *See* Exhibit Q.

[53] *See* Exhibit R.

[54] *See* Exhibit S.

28.     Arbors asserts that the court costs could have been avoided had the Wilsons simply appeared at the eviction hearing and defended themselves. Such assertion lacks all merit and improperly attempts to shift the burden of assuring Arbors' compliance with the automatic stay to the Wilsons. The Wilsons timely filed a suggestion of bankruptcy in the Eviction Action to prevent the action from moving forward. Such notice would have stopped the Eviction Action from moving forward but for Arbors' actions taken to convince the state court that the automatic stay was no longer in force pursuant to the Lift Stay Order.[55]

### (c) Lost Wages

29.     Sharonda Wilson testified that she was forced to miss work in order to complete the paperwork and otherwise take the steps necessary to initiate the Eviction Appellate Proceeding. Her unchallenged testimony was that she missed a total of 5 hours of work at an hourly rate of $17.21 per hour which resulted in her having lost wages of $86.05.

### (d) Attorneys' Fees and Expenses

30.     Finally, the Wilsons also seek the recovery of attorneys' fees and expenses incurred in having the Lee Firm represent them in connection with this adversary proceeding. Eric Maskell ("**Maskell**") of the Lee Firm testified on behalf of the Wilsons.

31.     Maskell explained that the matter was staffed with one attorney (Maskell) at a rate of $300 per hour, one senior paralegal at a rate of $150 per hour, and one standard paralegal at a rate of $125 per hour. Such rates are reasonable and customary within this District for the type of services performed by the Lee Firm. Among other things, Maskell's hourly rate compares quite favorably with the $450 per hour rate charged to Arbors by its counsel.

---

[55] *See* Exhibit N, at p.2 (eviction proceeding docket, second 1/29/2019 entry, which includes the following statement: "*PLTF'S ATTY PROVIDED ORDER LIFTING AUTOMATIC STAY*").

32.     Maskell further explained that the team expended a total of 52 hours in rendering services up to the time of trial, and that he had projected 8 hours of trial time utilizing the entire team, resulting in total fees of $11,962.50 based upon the above rates.  This equates to a blended rate of approximately $157.40 per hour for the team.[56]  Because the trial lasted a total of 2.8 hours instead of 8 hours, however, and because the use of all three professionals at trial was unnecessary (finding the use of Maskell and one standard paralegal to be reasonable), the total must be adjusted downward by a total of $2,587.60.[57]  This results in adjusted total fees of $9,374.90, an adjusted total of 57.6 hours expended in rendering services, and an adjusted blended rate of approximately $162.76 per hour.

33.     Given the nature of this adversary proceeding, the issues in dispute between the parties, the content of the Complaint and other pretrial filings prepared on behalf of the Wilsons, and the compilation of the exhibits introduced into evidence on behalf of the Wilsons, the Lee Firm's expenditure of 57.6 hours in representing the Wilsons through the conclusion of trial is reasonable and was necessary.

34.     Based upon the same considerations and based upon the result obtained by the Lee Firm on behalf of the Wilsons in this adversary proceeding, an award of $9,374.90 in attorneys' fees is reasonable.  And while Rigsby testified that, in her opinion, the amount of attorneys' fees sought by the Wilsons is unreasonable,[58] her experience as a consumer of legal services prior to

---

[56] Such rate calculated as follows: $11,962.50 / 76 hours (*i.e.* 52 pretrial hours *plus* 24 trial hours [8 hours x 3 professionals]) = $157.40 (appx.).

[57] Such amount is determined by, first, calculating the amount of the deduction to apply based upon the 8-hour trial estimate – $3,777.60 (*i.e.* 8 hours x $157.40 per hour blended rate x 3 professionals) – and then reducing that amount by the amount that may reasonably be awarded based upon the actual 2.8 hours of trial – $1,190 (*i.e.* $840 for attorney time [2.8 hours x $300 per hour attorney rate] *plus* $350 for paralegal time [2.8 hours x $125 per hour standard paralegal rate]).

[58] Noting that Arbors, itself, incurred at least $5,400 in attorneys' fees based upon the testimony of James Floyd.

this action has largely, if not exclusively, been limited to the engagement of a single firm – the Floyd Firm – and predominantly (if not exclusively) in state court eviction proceedings which, on balance, are considerably less complex and demanding. Consequently, given Rigsby's limited experience in engaging counsel, the Court did not find her testimony to be persuasive with respect to the reasonableness of attorneys' fees.

35. Separately, Maskell also provided uncontested testimony that the Lee Firm incurred $78.65 in actual and necessary court costs in connection with the engagement.

36. Thus, by virtue of Arbors' actions, the Wilsons have sustained additional damages in the aggregate amount of $9,453.55 for the reasonable and necessary attorneys' fees and expenses incurred by the Wilsons in pursuing this action.

### (2) *Punitive Damages*

37. Arbors' conduct in commencing and pursuing the Eviction Action to judgment was unquestionably egregious. The very fact that, after submitting the proposed order to the Court which the Court accepted and entered as the Lift Stay Order, Arbors sought to substantiate a default on the part of the Wilsons based upon the charging of a rental rate ($1,399 per month) in conflict with the rate agreed upon by the parties under the 2018 Lease and acknowledged to be applicable to the Wilsons under the order ($1,199 per month) smacks of bad faith. Arbors only magnified and perpetuated this bad faith in thereafter commencing the Eviction Action based upon the manufactured default and in representing to the state court that the higher, inapplicable rental rate applied. Then, when squarely confronted by way of heated exchanges between counsel with a challenge to the propriety of the Eviction Action and an assertion that the action was in violation of the automatic stay, instead of dismissing the action or at least putting the action on hold until clarification could be obtained from the Court, Arbors knowingly and willfully plowed forward in

its prosecution of the action to judgment in an effort to evict the Wilsons from the Apartment. In doing so, Arbors continued to misrepresent the applicable rate of the rent to the state court and, in the face of the Wilsons' suggestion of bankruptcy, wrongfully convinced the state court that the automatic stay was no longer in force under the terms of the Lift Stay Order to obtain entry of the Default Judgment. Finally, to exacerbate matters, Arbors' continuing misrepresentation of the rental rate has resulted in the Wilsons being forced to pay the higher $1,399 rate into the state court's registry on a monthly basis pending the outcome of this adversary proceeding in order to maintain their use and possession of the Apartment. Such conduct on the part of Arbors was and is egregious warranting an assessment of punitive damages.

38. Given the high degree of the reprehensibility of Arbors' conduct in this case, the amount of the actual compensable damages incurred by the Wilsons, as outlined above, and the level of penalties imposed in comparable cases,[59] an award of punitive damages in the amount of $10,000 is warranted and necessary to cause a change in behavior and have a deterrent effect.

**F.      *Arbors' Counterclaim Lacks Merit – The Wilsons' Filing of this Action Was Not Frivolous***

39. For the reasons set out above, the Wilsons' filing and prosecution of this action was clearly not frivolous. Therefore, there is no basis upon which to award any attorneys' fees to Arbors on account of its Counterclaim.

---

[59] *See* footnote 95, *infra*.

## CONCLUSIONS OF LAW

**A.     The 2018 Lease Governed the Parties' Leasing Relationship
         From and After November 10, 2018**

Arbors' defense in this case is largely dependent upon its assertion that it never agreed to the 2018 Lease and, correspondingly, the $1,199 monthly rental rate set forth in the 2018 Lease. Therefore, the Court must first address the enforceability of the 2018 Lease.

Arbors takes the position that because the 2018 Lease was never signed by any of its authorized representatives, the lease is unenforceable.  In this regard, the Texas Statute of Frauds provides that a lease of real estate for a term longer than one year is not enforceable against a party unless the lease is in writing and signed by such party.[60]  Here, the definitive term of the 2018 Lease is for *less* than one year – from November 10, 2018 to November 5, 2019.  However, the lease provides for its automatic renewal on a month-to-month basis at the end of the definitive term unless and until terminated on 60 days' notice.[61]  Thus, "although the lease speaks in terms of renewal, a lease containing provisions of this nature is treated as a present demise for the full period of time to which the lease may be extended subject to defeasance by a condition subsequent."[62]  In other words, because the term of the 2018 Lease, including automatic renewals, is for a period of time greater than one year, it is subject to the Statute of Frauds.  And because there is no evidence of Arbors having signed the lease, it would appear, on first blush, that the lease is unenforceable against Arbors under the Statute of Frauds.

---

[60] *See* Tex. Bus. & Com. Code § 26.01(a), (b)(5).

[61] *See* 2018 Lease, at ¶ 3.

[62] *Hampton v. Lum*, 544 S.W.2d 839, 840 (Tex. Civ. App. – Texarkana 1976, no writ); *see also McDonald v. Roemer*, 505 S.W.2d 698, 699 (Tex. Civ. App. – San Antonio 1974, no writ) ("A lease for a term of one year, but with an option to lessee to extend the term thereof for an additional period, is held to be a demise for the entire period….") (citing *Bateman v. Maddox*, 86 Tex. 546, 26 S.W. 51 (1894)).

This, however, is not the end of the story.  The secondary question is whether Arbors is nevertheless bound to the 2018 Lease on the basis of its conduct in offering the lease to the Wilsons, obtaining the Wilsons' acceptance and execution of the lease, and including the lease's new $1,199 rental rate in the proposed order submitted to the Court and entered as the Lift Stay Order.  In this regard, Texas law recognizes that under certain circumstances promissory estoppel may act to except a contract from the unenforceability provisions of the Statute of Frauds.[63]  As explained by the Fifth Circuit:

> Where a promisee acts to his detriment in reasonable reliance upon an otherwise unenforceable promise, … the disappointed party may have a substantial and compelling claim for relief…. "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

*MetroplexCore, LLC v. Parsons Transp., Inc.*, 743 F.3d 964, 977 (5th Cir. 2014) (quoting *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex. 1965) (in turn quoting Restatement of Contracts § 90)).

"Under Texas law, '[t]he requisites of promissory estoppel are: (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment."[64]  In addition to these requirements, the agreement which is the subject of the oral promise must also be in writing at the time of the oral promise.[65]  The Wilsons have the burden of proving each of these elements.[66]

---

[63] *Metropolitan Life Ins. Co. v. Haden & Co.*, 158 F.3d 584 (5th Cir. 1998); *see also Nagle v. Nagle*, 633 S.W.2d 796, 800 (Tex. 1982).

[64] *MetroplexCore, LLC v. Parson Transp., Inc. (In re MetroplexCore, LLC)*, 743 F.3d 964, 977 (5th Cir. 2014) (quoting *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983)); *see also Metropolitan Life*, 158 F.3d at *4 ("[C]ourts will enforce an oral promise to sign an instrument complying with the Statute of Frauds if: (1) the promisor should have expected that his promise would lead the promisee to some definite and substantial injury; (2) such injury occurred; and (3) the court must enforce the promise to avoid injustice") (quoting *Nagle*, 633 S.W.2d at 800).

[65] *Hurd v. BAC Home Loans Servicing, LP*, 880 F.Supp.2d 747, 761 (N.D. Tex. 2012); *Montalvo v. Bank of Am. Corp.*, 864 F.Supp.2d 567, 582 (W.D. Tex. 2012).

[66] *MetroplexCore*, 743 F.3d at 977; *see also Concord Oil Co. v. Alco Oil & Gas Corp.*, 387 S.W.2d 635, 639 (Tex. 1965).

Based upon the evidence presented, the Wilsons have successfully satisfied their burden of establishing each of the elements of promissory estoppel. First, in offering the 2018 Lease to the Wilsons, obtaining their electronic signatures thereon, and returning a copy of the lease to them for safekeeping, Arbors evidenced its promise to countersign the lease and treat it as binding upon the parties from and after November 10, 2018. Second, by virtue of the above-described actions of Arbors, the Wilsons' reliance on such promise was clearly foreseeable by Arbors. Such foreseeability was further strengthened by Arbors' incorporation of the 2018 Lease rental rate into the proposed order submitted to the Court and entered as the Lift Stay Order.[67] Finally, the Wilsons' reliance was both substantial, in that it served as the basis upon which the Wilsons made their rent payments in November 2018, December 2018 and January 2019, and detrimental, in that, in the absence of the enforceability of the offered and accepted 2018 Lease, the Wilsons were subject to the risk of the very type of adverse action taken by Arbors in this case – namely, the assessment of a higher $1,399 month-to-month rental rate, the declaration of a material default in the payment of rent, and the loss of the Wilsons' one-time, five-day grace period to cure under the Lift Stay Order. Accordingly, by application of the doctrine of promissory estoppel, Arbors is precluded from attacking the validity of the 2018 Lease under the Statute of Frauds and is, thus, bound to the terms of the 2018 Lease.

**B.**     ***Arbors' Conduct Did Not Rise to the Level of Abuse of Process***

Turning to the substantive claims asserted by the Wilsons, the Wilsons initially claim that Arbors is liable for abuse of process based upon its counsel's submission to the Court of the proposed order, which failed to incorporate all of the terms of the Court's Oral Ruling, without

---

[67] In this regard, even if promissory estoppel did not apply, Arbors would be judicially estopped from taking a position on rent in conflict with the terms of the proposed order submitted to the Court with its approval that the Court accepted and entered as the Lift Stay Order. *See Wells Fargo Bank, N.A. v. Oparaji (In re Oparaji)*, 698 F.3d 231, 235-38 (5th Cir. 2012) (discussing the doctrine of judicial estoppel).

first obtaining the approval of the Wilsons' counsel. In particular, the Wilsons assert that the proposed order was incomplete in failing to incorporate the November 2, 2018 deadline fixed by the Court under the Oral Ruling for the Wilsons' payment of November 2018 rent. The Wilsons claim that such action was damaging because, under the terms of the Lift Stay Order entered by the Court based upon the proposed order, Arbors was conceivably able to take the position that the Wilsons defaulted in the timely payment of November 2018 rent and was, thus, thereafter able to pursue eviction of the Wilsons from the Apartment when the Wilsons failed to pay January 2019 rent by January 1, 2019. While Arbors has no real explanation for its counsel's failure to incorporate all of the terms of the Oral Ruling and failure to comply with the Court's direction with respect to submission of the proposed order, it asserts that the omission was nevertheless harmless and not actionable. The Wilsons further assert that Arbors' actions "in failing to comply with or seek relief from the automatic stay" also constitute an abuse of process.[68] Arbors similarly disputes any wrongdoing in relation to this assertion and claims that its actions were permissible.

"'Process' is traditionally defined as the writ, summons, mandate, or other process which is used to inform the defendant of the beginning of judicial proceedings against him and to compel his appearance in court….In a narrow sense, process refers to individual writs issued by the court during or after judicial proceedings."[69] Thus, an abuse of process is the "malicious misuse or misapplication of a regularly issued civil or criminal process to obtain a result not lawfully warranted or properly attainable by the process."[70] To establish a claim for abuse of process, a plaintiff must show: (1) an illegal, improper or perverted use of process which is neither warranted

---

[68] Complaint, ¶¶ 51.

[69] *Kjellvander v. Citicorp*, 156 F.R.D. 138, 142 (S.D. Tex. 1994) (citing *Snyder v. Byrne*, 770 S.W.2d 65, 69 (Tex. App. – Corpus Christi 1989, no writ)).

[70] *Kjelvander*, 156 F.R.D. at 142 (citing *Tandy Corp. v. McGregor*, 527 S.W.2d 246, 249 (Tex. Civ. App. – Texarkana 1975, writ ref'd n.r.e.)).

nor authorized under the law; (2) an ulterior motive or purpose in exercising such use; and (3) damages as a result of the illegal act.[71]

Focusing first on the Wilsons' assertion that Arbors' conduct in "failing to comply with or seek relief from the automatic stay" constituted an abuse of process, such assertion lacks merit for the very simple reason that no "process" is identified within the assertion. Turning next to issues concerning the proposed order, under certain circumstances, the submission of a proposed order accepted and entered by a court may constitute a form of "process." And where the proposed order includes relief against an opposing party that was clearly not granted by the court or includes terms effectively negating relief that the court expressly granted to the opposing party such conduct may rise to the level of an abuse of process. Here, however, while the Floyd Firm failed to incorporate the entirety of the Court's Oral Ruling – having omitted reference to the November 2, 2018 deadline for the Wilsons' payment of November 2018 rent – and also failed to honor the Court's directive with respect to obtaining approval of the form of the order prior to its submission, the Court does not find such conduct to rise to the level of an abuse of process. Among other things, the Wilsons have failed to satisfy the burden of proving that the submission of the proposed order with the noted omission and without counsel approval was, in and of itself, undertaken with any ulterior motive or purpose on the part of Arbors. Additionally, based upon the fact that Arbors is not claiming a rent payment default based upon the *timing* of the Wilsons' November 2018 rent payment, the Wilsons have failed to prove that they have suffered any damage. As previously explained, the timing of the November 2018 rent payment is not the basis upon which Arbors acted. Arbors has admitted that the Court established a November 2, 2018 deadline for the

---

[71] *See Sanijet Corp. v. Beauty Mall, Ltd.*, Civ. Action No. 3:06-CV-0135-L, 2007 WL 9717298, at *3 (N.D. Tex. Oct. 24, 2007) (discussing elements under Texas law).

payment of November rent and that the Wilsons made payment by such deadline.[72]  Instead, Arbors' argument is based upon the alleged *insufficiency* of the amount of the rent paid in November (and December).

Moreover, the Wilsons and their counsel had an independent duty to review the Lift Stay Order, once entered, and to timely request relief from the order to the extent of any concerns as to its content.  In this case, they failed to do so, allowing the Lift Stay Order to become final.  Had the Wilsons taken timely action, the Lift Stay Order could have been amended to incorporate the omitted November 2018 rent payment deadline.  For this additional reason, the Wilsons' abuse of process claim will be denied.

## C.    *Arbors' Violation of the Automatic Stay and Remedies in Relation Thereto*

The primary focus of the Wilsons' Complaint is on Arbors' alleged violation of the automatic stay in commencing and prosecuting the eviction action against the Wilsons.[73]  The Wilsons request relief in the form of an award of statutory compensatory and punitive damages, including attorneys' fees and costs, a finding of contempt and sanctions, declaratory relief with respect to the invalidity of the Default Judgment, and injunctive relief.

Starting with the question of whether the automatic stay was violated, upon the commencement of a chapter 13 bankruptcy case the automatic stay of section 362(a) of the Bankruptcy Code – a statutory injunction designed to protect the chapter 13 debtor and the debtor's

---

[72] *See* Pretrial Order, ¶¶ B.9 and B.11.

[73] The Wilsons make the somewhat related assertion that Arbors violated the Oral Ruling and/or Lift Stay Order.  *See* Complaint, ¶¶ 47-48; Pretrial Order, ¶ A.  Because neither the Oral Ruling nor the Lift Stay Order expressly compelled or precluded any action on the part of Arbors, Arbors' actions did not result in a violation of either the Oral Ruling or the Lift Stay Order.  The relevant question is instead whether Arbors had obtained relief from the automatic stay under the Oral Ruling/Lift Stay Order on account of the *Wilsons'* actions or omissions prior to the time of Arbors' initiation of the Eviction Action.

estate – is immediately imposed.[74]  The automatic stay is perhaps the single most important and fundamental protection provided to an individual debtor in bankruptcy.  Among other things, section 362(a)(3) of the Bankruptcy Code provides that the filing of a petition for relief under the Bankruptcy Code "operates as a stay, applicable to all entities, of … any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[75]

A debtor's possessory interest in real property, including a leasehold interest, constitutes property of the debtor's bankruptcy estate subject to the protections of the automatic stay.[76] Therefore, section 362(a)(3) prevents any act by a debtor's landlord to terminate the debtor's leasehold interest, to regain possession of the leased property to the exclusion of the debtor, or to otherwise exercise non-consensual control over the leased property without first obtaining relief from the automatic stay.  Arbors does not dispute any of these propositions.  Instead, Arbors argues that its actions in commencing and prosecuting the Eviction Action were permissible because, under the terms of the Lift Stay Order, Arbors had obtained relief from the automatic stay by the time of its initiation of the Eviction Action.  Arbors is incorrect.

Pursuant to the Lift Stay Order, which was entered by the Court on November 8, 2018, the Wilsons were "to continue[77] paying the monthly rent of $1,199.00 … for the term of their Lease

---

[74] *See* 11 U.S.C. § 362(a).

[75] *Id.* § 362(a)(3).

[76] *See Cuffee v. Atlantic Bus. & Cmty. Dev. Corp. (In re Atlantic Bus. & Cmty. Dev. Corp.)*, 901 F.2d 325, 328 (3rd Cir. 1990); *48th Street Steakhouse*, 835 F.2d at 430; *In re Salov*, 510 B.R. 720, 729 (Bankr. S.D.N.Y. 2014); 11 U.S.C. §§ 541(a)(1) and 1306(a)(1).

[77] While the Lift Stay Order makes specific reference to the deadline for making the October 2018 rent payment, no separate mention is made of the deadline for making the November 2018 rent payment as previously discussed.  The omission arguably results in some ambiguity with respect to whether the Wilsons' obligations with respect to "continuing" rent payments applied after payment of the October 2018 rent or after entry of the Lift Stay Order on November 8, 2018.  Irrespective of the language in the Lift Stay Order, the parties have stipulated that the Wilsons were required to make their November 2018 rent payment by November 2, 2018 pursuant to the Court's Oral Ruling.  *See* Pretrial Order, ¶ B.9.  By the time of the Court's entry of the Lift Stay Order on November 8, 2018, the Wilsons

… [and] to make the monthly payments by the first day of each month but are given a one-time grace period of five (5) days [to cure a default of such obligation].  If payment is not made in a timely manner, relief from the automatic stay is hereby granted to permit [Arbors] to proceed with an eviction claim" against the Wilsons.[78]  With these provisions in mind, following entry of the Lift Stay Order, the Wilsons paid their December 2018 rent of $1,199 by December 1, 2018[79] but failed to pay their January 2019 rent of $1,199 by January 1, 2019.  Under the terms of the Lift Stay Order, however, they had a one-time, five-day grace period to cure such default, and on January 2, 2019, tendered their January 2019 rent of $1,199 within such grace period.  Thus, under the terms of the Lift Stay Order, relief from the automatic stay had not yet been afforded to Arbors in January 2019.

Arbors argues otherwise predicated on the assertion that the proper monthly rental rate in November 2018, December 2018 and January 2019 was $1,399.  Thus, because the Wilsons failed to pay rent of $1,399 in November and December 2018, Arbors asserts that these defaults triggered the one-time, five-day cure period *prior* to January 2019, such that upon the Wilsons' failure to pay their January 2019 rent by January 1, 2019, as well as the Wilsons' failure to pay rent in the amount of $1,399, relief from the automatic stay was triggered effective January 2, 2019.  Because the predicate for Arbors' argument – namely, the applicability of the monthly rental rate of $1,399 instead of the monthly rental rate of $1,199 under the terms of the 2018 Lease as memorialized in the Lift Stay Order – is faulty, Arbors' assertion that relief from the automatic stay was triggered

---

had already timely made both their October 2018 rent payment and their November 2018 rent payment in accordance with the Oral Ruling.  *See* Exhibit 1, at p.3; Pretrial Order, ¶¶ B.9 and B.11.  Thus, the "continuing" rent payment obligations of the Lift Stay Order should be construed as being applicable to prospective rent obligations as of entry of the Lift Stay Order on November 8, 2018 (*i.e.* commencing with December 2018 rent).

[78] Exhibit I, at p.2.

[79] *See* Exhibit 1, at p.3; Pretrial Order, ¶ B.11.

effective January 2, 2019 is likewise faulty. Consequently, Arbors' actions in commencing and prosecuting the Eviction Action were in violation of section 362(a)(3) of the Bankruptcy Code.

### (1)    Statutory Damages Under Section 362(k) of the Bankruptcy Code

Turning to remedies, the Wilsons first request an award of both compensatory and punitive damages under section 362(k) of the Bankruptcy Code. Section 362(k) provides in relevant part that "an individual injured by any willful violation of [the automatic stay] shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."[80] In order to satisfy the willfulness standard of section 362(k) for the recovery of damages thereunder, the individual claiming injury must establish the following three elements: (1) the defendant knew of the existence of the automatic stay; (2) the defendant's acts were intentional; and (3) the acts violated the stay.[81] As to the second element, it is unnecessary to prove that the defendant intended to violate the stay itself; instead, the statute only requires that the defendant intended to take the actions that violated the stay.[82] The individual seeking relief under section 362(k) has the burden of proving each of these three elements by a preponderance of the evidence.[83]

The Wilsons have satisfied each of these three elements. First, Arbors was clearly aware of the existence of the automatic stay at the time of its commencement and prosecution of the Eviction Action. Indeed, the events leading up to this dispute started with Arbors' request for relief from the automatic stay, which was conditionally denied subject to the Wilsons' continuing

---

[80] 11 U.S.C. § 362(k)(1).

[81] *See Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 302 (5th Cir. 2005); *see also Young v. Repine (In re Repine)*, 536 F.3d 512, 519 (5th Cir. 2008), *cert. denied*, 555 U.S. 1138 (2009).

[82] *See Chesnut*, 422 F.3d at 302 (quoting *Tsafaroff v. Taylor (In re Taylor)*, 884 F.2d 478, 482 (9th Cir. 1989)); *Collier v. Hill (In re Collier)*, 410 B.R. 464, 472 (Bankr. E.D. Tex. 2009).

[83] *Collier*, 410 B.R. at 472.

compliance with the rent payment obligations of the Lift Stay Order. Additionally, upon Arbors' refusal to accept the Wilsons' January 2019 rent payment, and even more forcefully after Arbors had initiated the Eviction Action, the Lee Firm had heated conversations with Arbors' counsel concerning the continuing enforceability of the automatic stay. Ultimately, the Wilsons even filed a suggestion of bankruptcy in the Eviction Action to prevent the proceedings from moving forward. Thus, there is no question about Arbors' knowledge of the stay. Moreover, the fact that Arbors was under the misguided belief that the stay had lifted under the terms of the Lift Stay Order is of no moment. The question is not whether Arbors had the subjective belief of the continuing applicability of the automatic stay to its actions, but rather whether Arbors was aware of the existence of the automatic stay.[84] Second, there is similarly no question about Arbors' intentional conduct in commencing and prosecuting the Eviction Action. The evidence is clear that upon the Wilsons' failure to pay January 2019 rent by January 1, 2019, Arbors consciously decided to refuse the January 2nd payment and expeditiously initiate the Eviction Action against the Wilsons. Thereafter, in the face of heated exchanges between the parties' counsel and the Wilsons' filing of the suggestion of bankruptcy, Arbors consciously decided to prosecute the Eviction Action to judgment. Finally, for the reasons already discussed, Arbors' commencement and prosecution of the Eviction Action violated the automatic stay provisions of section 362(a)(3) of the Bankruptcy Code. Therefore, the Wilsons' have successfully established that Arbors willfully violated the automatic stay in commencing and prosecuting the Eviction Action.

---

[84] *See Chesnut*, 422 F.3d at 302 ("Whether the [defendant] believes in good faith that it had a right to [act in contravention of the automatic stay] is not relevant to whether the act was 'willful' or whether compensation must be awarded") (quoting *Taylor*, 884 F.2d at 482); *In re Webb*, 472 B.R. 665, at *15 (6th Cir. B.A.P. 2012) ("A creditor's good faith belief that its intentional actions did not violate the automatic stay is not a defense to a § 362(k) action"); *Collier*, 410 B.R. at 472.

Based upon the foregoing, section 362(k) of the Bankruptcy Code mandates the award of actual damages, including costs and attorneys' fees.[85] Here, the Wilsons have established that they suffered actual compensatory damages of $12,046.07 less the amount of 2/2019-11/2019 Additional Lease Charges (if, and to the extent, not already separately paid by the Wilsons).[86] In the case of attorneys' fees and costs, while section 362(k) does not expressly impose a requirement that such fees and costs be reasonable and necessary,[87] "courts have determined that such an award must be 'reasonable and necessary,' and that courts should 'closely scrutinize the fees requested by attorneys for unnecessary and excessive charges.'"[88] Accordingly, the Court closely scrutinized the fees and expenses requested by the Wilsons and, for the reasons set forth above, has determined that the $9,453.55 in attorneys' fees and expenses included in the above $12,046.07 figure were actually and necessarily incurred and are reasonable under the facts and circumstances of this case.[89]

Turning next to punitive damages, section 362(k) provides that such damages "may" be recovered by an individual injured by a willful violation of the stay "in appropriate

---

[85] *See* 11 U.S.C. § 362(k)(1) ("an individual injured by any willful violation of [the automatic stay] *shall recover* actual damages, including costs and attorneys' fees") (emphasis added); *see also Garza v. CMM Enters., LLC (In re Garza)*, 605 B.R. 817, 829 (Bankr. S.D. Tex. 2019) ("Section 362(k)(1) mandates that one injured by a willful stay violation 'shall recover' actual damages, costs and attorneys' fees….The words 'shall recover' indicate that Congress intended that the award of actual damages, costs, and attorneys' fees be mandatory upon a finding of a willful violation of the stay").

[86] Such compensatory damages are comprised of rent-related damages of $2,221.27 less the amount of 2/2019-11/2019 Additional Lease Charges (if, and to the extent, not already separately paid by the Wilsons) *plus* court costs of $285.20 incurred in connection with the Eviction Appellate Proceeding *plus* lost wages of $86.05 with respect to Sharonda Wilson *plus* $9,453.55 in reasonable and necessary attorneys' fees and expenses.

[87] *Compare* 11 U.S.C. § 330(a)(1) (requiring fees and expenses awardable to estate professionals to be actual, necessary and reasonable), *with* 11 U.S.C. § 362(k) (omitting reference to any standards).

[88] *See Collier*, 410 B.R. at 478 (quoting *In re Parry*, 328 B.R. 655, 659 (Bankr. E.D.N.Y. 2005)).

[89] *See also Repine*, 536 F.3d at 522 (explaining that fees incurred in prosecuting an action under § 362(k) are recoverable). Because the Wilsons have established a basis for the award of attorneys' fees and expenses under section 362(k), it is unnecessary for the Court to consider the additional and alternative grounds for the award of attorneys' fees and expenses asserted within the Complaint.

circumstances."[90]  "The availability of punitive damages in this context 'encourages would-be [stay] violators to obtain declaratory judgments before seeking to vindicate their interests in violation of an automatic stay, and thereby protects debtors' estates from incurring potentially unnecessary legal expenses in prosecuting stay violations.'  Such damages are generally designed to cause a change in the creditor's behavior and serve as a deterrent to certain actions of creditors…."[91]  Accordingly, the Fifth Circuit has interpreted "appropriate circumstances" as requiring a determination of "egregious conduct" on the part of the defendant.[92]

As explained above, Arbors' conduct in commencing and pursuing the Eviction Action to judgment was unquestionably egregious warranting an assessment of punitive damages.[93]  "In determining the amount of punitive damages to award, the Court considers (1) the degree of reprehensibility of the defendant's conduct, (2) the disparity between the harm or potential harm to the plaintiff and the punitive damages, and (3) the difference between penalties imposed in comparable cases."[94]  Thus, given the high degree of the reprehensibility of Arbors' conduct in this case, the amount of the actual compensable damages incurred by the Wilsons, as outlined above, and the level of penalties imposed in comparable cases,[95] the Court finds and concludes that an award of punitive damages in the amount of $10,000 is warranted and necessary to cause a change in behavior and to have the requisite deterrent effect.

---

[90] 11 U.S.C. § 362(k)(1).

[91] *Collier*, 410 B.R. at 478 (citations omitted) (quoting *Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1105 (2nd Cir. 1990)).

[92] *See Repine*, 536 F.3d at 521 ("Section 362(k) allows punitive damages 'in appropriate circumstances.'….We agree that an egregious conduct standard is applicable"); *see also In re Lara*, 569 B.R. 231, 237 (Bankr. N.D. Tex. 2017); *Bruner-Halteman v. Educational Credit Mgmt. Corp. (In re Bruner-Halteman)*, Adv. No. 14-03041, 2016 WL 1427085, at *8 (Bankr. N.D. Tex. Apr. 8, 2016); *Collier*, 410 B.R. at 478.

[93] *See* discussion of punitive damages in Finding of Fact, Section E(2), *supra*.

[94] *Bruner-Halteman*, 2016 WL 1427085, at *9 (citing *BMW of N. Am. v. Gore*, 517 U.S. 559, 574-75 (1996)).

[95] *See, e.g., Lara*, 569 B.R. at 237 (awarding $24,000 in punitive damages); *Bruner-Halteman*, 2016 WL 1427085, at *9 (awarding $74,000 in punitive damages); *Collier*, 410 B.R. at 480 (awarding $3,000 in punitive damages).

### (2)    *Contempt and Sanctions*

Pursuant to Count IV of the Complaint, the Wilsons request that Arbors also be found to be in contempt and sanctioned for its "flagrant disregard for 11 U.S.C. ¶ 362 and this Court's [Lift Stay Order]" and for its "flagrant disregard of the automatic stay and Bankruptcy Rules through bad faith negotiations to resolve its violations of the automatic stay and this Court's order."[96] When it comes to contempt and sanctions, the starting point is section 105(a) of the Bankruptcy Code which provides the Court with the inherent authority to "issue any order … or judgment that is necessary or appropriate to carry out the provisions of the [Bankruptcy Code]."[97] Thus, pursuant to section 105(a), "in addition to its power under § 362(k) of the Bankruptcy Code, the Court has general contempt power over violations of the automatic stay, including the power to impose coercive sanctions to prevent such violations from continuing."[98] Of importance, however, such power is limited to civil contempt, the purpose of which is to coerce compliance with an order of the Court or the Bankruptcy Code, or to compensate a party for the contemnor's violation.[99] Thus, based upon the non-punitive purposes of civil contempt, the Court does not have the authority to award punitive damages for civil contempt.[100]

---

[96] Complaint, ¶¶ 47-49.

[97] *See* 11 U.S.C. § 105(a).

[98] *In re Congregation Birchos Yosef*, 535 B.R. 629, 635 (Bankr. S.D.N.Y. 2015) (citing *Bartel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 171 B.R. 18, 21 (S.D.N.Y. 1994)), *appeal dism'd*, 2016 WL 5394755 (S.D.N.Y. 2016), *aff'd*, 699 Fed. Appx. 91 (2nd Cir. 2017); *see also Placid Ref. Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.)*, 108 F.3d 609, 613 (5th Cir. 1997) (§ 105(a) provides the authority to "issue any order, including a civil contempt order, necessary or appropriate to carry out the provisions of the bankruptcy code"). In fact, for debtors other than natural persons, contempt proceedings are the proper means for seeking relief for violations of the stay given that section 362(k) only applies to individual debtors. *Maritime Asbestos Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.)*, 920 F.2d 183, 186-87 (2nd Cir. 1990).

[99] *See Marable v. Sam Pack's Ford Country of Lewisville, Ltd. (In re Emergency Room Mobile Servs., LLC)*, 529 B.R. 676, 693 (N.D. Tex. 2015) (citing *Garrett v. Coventry II DDR/Trademark Montgomery Farm, LP (In re White-Robinson)*, 777 F.3d 792, 795 (5th Cir.), *cert. denied*, 136 S. Ct. 52 (2015)).

[100] *Marable*, 529 B.R. at 692.

With the foregoing in mind, and for reasons previously explained, Arbors' actions in commencing and prosecuting the Eviction Action against the Wilsons were in flagrant disregard of the automatic stay. Thus, the Wilsons have established grounds for a determination of civil contempt against Arbors and, correspondingly, additional grounds for the award of compensatory (but not punitive) damages, including attorneys' fees and expenses, in the amounts set forth above as sanctions for Arbors' contumacious conduct.

As for the other grounds for contempt raised by the Wilsons, the Court finds no basis on which to hold Arbors in contempt for violation of the Lift Stay Order. The Lift Stay Order neither expressly compelled nor precluded any action on the part of *Arbors*. Instead, it conditionally denied Arbors' request for relief from the automatic stay subject to the *Wilsons'* continuing payment of rent. Similarly, the Court finds no basis on which to hold Arbors in contempt for "bad faith negotiations to resolve its violations of the automatic stay and the Court's order" because neither the Bankruptcy Code nor the Lift Stay Order imposed an express obligation on Arbors to undertake any negotiations.

### *(3)* ***Declaratory and Injunctive Relief***

Finally, the Wilsons request that the Default Judgment be declared void and that the Court provide injunctive relief to compel Arbors' prospective compliance with the Bankruptcy Code in pursuing any further relief against the Wilsons. Because the Default Judgment was entered in violation of the automatic stay, there is no question that the Default Judgment is unenforceable against the Wilsons. That said, actions taken in violation of the automatic stay are generally treated as *voidable* as opposed to *void* within this Circuit.[101] Therefore, while the Wilsons have

---

[101] *See Jones v. Garcia (In re Jones)*, 63 F.3d 411, 412 (5th Cir. 1995) ("It is well-settled that 'actions taken in violation of an automatic stay are not *void*, but rather they are merely *voidable*, because the bankruptcy court has the power to annul the automatic stay pursuant to section 362(d)") (quoting *Picco v. Global Marine Drilling Co*., 900 F.2d 846,

established grounds for the provision of declaratory relief, the Court's provision of such relief will be limited to a declaration that the Default Judgment is both unenforceable against the Wilsons and voidable based upon its entry in violation of the automatic stay. Such limitation, however, blends into the Wilsons' corollary request for injunctive relief.

Because of the existence of the Default Judgment and Arbors' prior disregard of the stay, the Court finds that sufficient grounds have been established by the Wilsons for the issuance of injunctive relief (a) precluding Arbors from enforcing the Default Judgment against the Wilsons, (b) requiring Arbors, until the time of expiration of the automatic stay pursuant to the provisions of section 362(c)(1) and (c)(2) of the Bankruptcy Code, and notwithstanding any provisions in the Lift Stay Order to the contrary, to obtain the express approval of this Court before pursuing any action in furtherance of either the termination of the 2018 Lease (including renewals thereof in accordance with the automatic renewal provisions of paragraph 3 of the 2018 Lease) or the eviction of the Wilsons from the Apartment, and (c) requiring Arbors to cooperate with the Wilsons in disposing of the Eviction Appellate Proceeding in a manner consistent with these Findings of Fact and Conclusions of Law and the Final Judgment that is entered by the Court in relation hereto, including, without limitation, that the Wilsons be credited with having timely made payment of their December 2019 rent and associated additional lease charges, effective as of the date of entry of the Final Judgment in this matter, by way of a credit against the amount of damages awarded against Arbors.

---

850 (5th Cir. 1990)), *cert. denied*, 517 U.S. 1167 (1996); *Singleton v. Abusaad (In re Abusaad)*, 309 B.R. 895, 898 (Bankr. N.D. Tex. 2004).

### *CONCLUSION*

Based upon the foregoing, and in summary, the Court will separately issue a Final Judgment:

(1)     Determining that Arbors' actions in commencing and prosecuting the Eviction Action against the Wilsons violated the automatic stay provisions of section 362(a)(3) of the Bankruptcy Code;

(2)     Determining that Arbors' actions in commencing and prosecuting the Eviction Action against the Wilsons in contravention of the automatic stay provisions of section 362(a)(3) of the Bankruptcy Code constituted actionable civil contempt for which relief may be afforded to the Wilsons under section 105(a) of the Bankruptcy Code;

(3)     Determining that the Default Judgment is unenforceable against the Wilsons and voidable as a result of its entry in violation of the automatic stay provisions of section 362(a)(3) of the Bankruptcy Code;

(4)     Awarding the Wilsons compensatory damages against Arbors under section 362(k) of the Bankruptcy Code, and as sanctions for civil contempt, in the amount of $12,046.07 less the amount of the 2/2019-11/2019 Additional Lease Charges (if, and to the extent, not already separately paid by the Wilsons);

(5)     Awarding the Wilsons punitive damages against Arbors under section 362(k) of the Bankruptcy Code in the amount of $10,000.00;

(6)     Awarding the Wilsons post-judgment interest at the applicable federal post-judgment statutory rate on the damages awarded (subject to the December 2019 rent and related additional lease charges credit detailed below) until paid;

(7)     Enjoining Arbors from enforcing the Default Judgment against the Wilsons;

(8)     Compelling Arbors (a) until the time of expiration of the automatic stay pursuant to the provisions of section 362(c)(1) and (c)(2) of the Bankruptcy Code, and notwithstanding any provisions of the Lift Stay Order to the contrary, to obtain the express approval of this Court before pursuing any action in furtherance of either the termination of the 2018 Lease (including renewals thereof in accordance with the automatic renewal provisions of paragraph 3 of the 2018 Lease) or the eviction of the Wilsons from the Apartment, and (b) to cooperate with the Wilsons in disposing of the Eviction Appellate Proceeding in a manner consistent with these Findings of Fact and Conclusions of Law and the Final Judgment entered in this action, including, without limitation, that the Wilsons be credited with having timely made payment of their December 2019 rent and associated additional lease charges, effective as of the date of the entry of the Final Judgment, by way of a credit against the amount of damages awarded against Arbors; and

(9)    Denying all other requested relief in the Complaint, as well as in Arbors' Counterclaim, with prejudice.

# # #   END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW   # # #